IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

☑ FILED ___ ENTERED
___ LOGGED _____ RECEIVED

12:07 pm, Nov 09 2021

AT BALTIMORE
CLERK, U.S. DISTRICT COURT
DISTRICT OF MARYLAND
BY _____ Deputy

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF ONE CELLULAR PHONE CURRENTLY IN ATF CUSTODY IN BALTIMORE, MARYLAND | Case No. 1:21-mj-2975 TMD |
| IN THE MATTER OF THE AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT AUTHORIZING A DNA SAMPLE COLLECTION FROM TYREE BENTON | Case No. 1:21-mj-2976 TMD |

### AFFIDAVIT IN SUPPORT OF SEARCH WARRANTS

I, Adam St. John, Special Agent ("SA") with the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), being duly sworn, depose and state as follows:

**I.      PURPOSE OF THIS AFFIDAVIT**

1.      I submit this affidavit in support of applications for two search warrants:

a.      The <u>first</u> warrant would authorize the search of one black Apple iPhone 12 bearing IMEI# 359669608706239 ("**SUBJECT TELEPHONE**"), further described in Attachment A-1, which is presently in the custody of the ATF in Baltimore, Maryland. The search warrant would specifically authorize members of ATF, or their authorized representatives, to examine the **SUBJECT TELEPHONE** for the purposes of seizing electronically stored data, further described in Attachment B-1.

b.      The <u>second</u> warrant would authorize members of the ATF, or their authorized representatives, to obtain samples of Deoxyribonucleic Acid ("DNA") for comparison purposes in the form of saliva from Tyree BENTON**,** a man born in 1993, assigned a Social Security number ending in 8954, and assigned a FBI number ending in 3AE3, as depicted in Attachment A-2, pursuant to Federal Rule of Criminal Procedure 41. BENTON is currently incarcerated at the Central Booking and Intake Center, located at 300 East Madison Street, Baltimore, Maryland 21202. The warrant would authorize members of the ATF, or their authorized representatives, to obtain DNA contained within saliva samples from BENTON, as described in Attachment B-2.

2.      I submit this affidavit for the limited purpose of establishing probable cause for the requested warrants. I have not included every fact known to me concerning this investigation to date. Rather, I set forth only those facts I believe are necessary to establish probable cause. I have

1

not, however, excluded any information known to me that would defeat a determination of probable cause. The information set forth in this affidavit derives from my personal knowledge and observations; discussions with other law enforcement officers and witnesses; and my review of police reports and public records. All conversations and statements described in this affidavit are related in substance and in part unless otherwise indicated.

3. The ATF and Baltimore Police Department ("BPD") have been investigating Tyree BENTON for violation of 18 U.S.C. § 922(g) (possession of a firearm by a prohibited person), 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances), and 18 U.S.C. § 924(c) (possession of a firearm in furtherance of drug trafficking) ("**SUBJECT OFFENSES**"). I submit that there is probable cause to believe that the **SUBJECT TELEPHONE** contains evidence of the **SUBJECT OFFENSES**. In addition, the gun at issue in this case (a Black High Point 9mm Handgun, Serial #P1293555), was swabbed by BPD for DNA and the swabs were retained. Therefore, I respectfully request that this Court find probable cause that evidence of the **SUBJECT OFFENSES** is also contained in the form of DNA in saliva in the possession of BENTON.

## II.   AFFIANT BACKGROUND AND EXPERIENCE

4. I am an "investigative or law enforcement officer of the United States" within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18.

5. I have been an ATF SA since 2018. I am currently assigned to the ATF Baltimore Field Division, Baltimore VI Field Office. I have attended the United States Department of Homeland Security's Criminal Investigator Training Program and ATF's Special Agent Basic

Training, both located in Glynco, Georgia, for a combined period of twenty-six weeks. I have received extensive training, both formal and on-the-job, in the provisions of the Federal Firearms Laws and Federal Narcotics Laws administered under Title 18, Title 21, and Title 26 of the United States Code. As an ATF agent, I have conducted and participated in investigations concerning violations of federal firearm laws, violations of federal controlled substance laws, and the commission of violent crimes.

6. I have received specialized training regarding, and have personally participated in, various types of investigative activities in connection with these investigations, including, but not limited to, the following: (a) physical surveillance; (b) the debriefing of defendants, witnesses, informants, and other individuals who have knowledge concerning violations of federal firearms and controlled substance laws; (c) the execution of search and/or arrest warrants; (d) the consensual monitoring and recording of conversations; (e) electronic surveillance through the use of pen registers; and (f) the handling, maintenance, and examination of evidence to include wireless telephones and computers. Prior to being employed as a Special Agent, I was employed as a licensed forensic engineer at the ATF National Laboratory Center for nine years. I have testified as an expert witness in criminal court on multiple occasions and have forensically analyzed hundreds of ATF crime scenes across the country.

7. Through my training and experience, I know the habits, methods, routines, practices, and procedures commonly employed by persons engaged in trafficking controlled dangerous substances ("CDS") and unlawfully possessing and/or using firearms. These individuals use cellphones to coordinate with suppliers, customers, and co-conspirators. They frequently switch phones or use multiple phones to evade detection. They further use cellphones and other electronic devices to record their trafficking and other criminal activities, to conceal

proceeds of their illegal conduct, and to evade law enforcement. For example, they use cellphones, addresses, and vehicles subscribed or registered to names other than their own in order to avoid detection by law enforcement.

8. Based upon my training and experience, I have additionally learned the following:

   a. Cellular telephones are an indispensable tool to those who engage in the firearms and narcotics trafficking trade, and those who unlawfully possess and use illegal firearms. These individuals use cellular telephones, push-to-talk telephones, Short Message Service ("SMS"), electronic-mail, and similar electronic means and/or devices, often under fictitious names or names other than their own, in order to maintain contact with other conspirators. Thus, these electronic devices hold valuable evidence of conversations between suspects regarding the unlawful possession, use, and trafficking of firearms, and the unlawful trafficking of narcotics;

   b. Firearms and narcotics traffickers, and individuals who unlawfully possess and/or use firearms, also use cellular devices to maintain records of their illegal activities, including telephone number "contact lists," address lists, photographs of firearms and narcotics (among other things), and other personal identifiable information or information related to individuals who may have assisted in the purchasing and storage of firearms, drugs, and/or ammunition; and

   c. Firearms and narcotics traffickers, and individuals who unlawfully possess and/or use firearms, use cellular telephones, pagers and other electronic communications devices to facilitate illegal transactions and keep in contact with co-conspirators. The electronically stored information on these devices is of evidentiary value in identifying other members of the conspiracy and establishing the relationship between these individuals, including photographs, texts, social media messages, and other identifying information stored on these devices.

9. I also know based on my training and experience that DNA can be found on items such as clothing and firearms and can be compared to a sample of DNA from a known person. This comparison can help identify or eliminate suspects. I further know that the Baltimore City Forensics lab will not test firearms for the presence of DNA (or do any subsequent comparison) without a standard to which it can be compared.

### III. PROBABLE CAUSE

10. On August 4, 2021, BPD officers stopped a green Honda Accord after seeing the driver turn without using a turn signal and noticing that the driver was not wearing a seat belt. As the officers approached the car, the driver opened his door, looked back at the officers, and then quickly closed the door. The front passenger, later identified as Tyree BENTON, subsequently leaned forward in the passenger's seat and repositioned his body.

11. Officers ran the driver and BENTON's information through the National Crime Information Center database and requested a K9 unit to the scene. The car had a temporary license plate that was not valid, and the car was not registered to anyone. While officers waited for the K9 unit to arrive, BENTON remained in the front passenger seat and watched videos on the **SUBJECT TELEPHONE**.

12. When the K9 unit arrived, officers asked the driver and BENTON to step out of the car. The K9 scanned the car and immediately alerted to the driver's door. Officers told the driver and BENTON they would be searching the car because of the positive alert, at which point BENTON appeared to become nervous and stared at the front passenger seat. During the search, officers located a black satchel under the front passenger seat where BENTON had been sitting. In the satchel, they found a black High Point 9mm Luger Handgun bearing serial # P1293555, 8 live rounds of live 9mm ammunition, one live round of .357 ammunition, 2 clear plastic baggies containing white powder residue, and 35 small gel capsules containing powder substance of suspected CDS. The officers placed BENTON and the driver under arrest, at which time they also took the **SUBJECT TELEPHONE** from BENTON.

13. During a post-*Miranda* interview on scene, BENTON told officers that the satchel was not his and that he did not know it was in the car.

14. Further investigation revealed that BENTON has been convicted of a crime punishable by a term of imprisonment exceeding one year. Specifically, in 2020, BENTON was convicted of unlawful possession of a firearm in the Circuit Court for Baltimore City, Maryland and sentenced to 5 years' incarceration. Accordingly, at the time BENTON possessed the firearm on August 4, 2021, he was prohibited from possessing a firearm and knew or should of know that he had been convicted of a crime punishable by imprisonment for a term exceeding one year.

15. Based on my training and experience, I believe the substances found in the satchel are controlled substances possessed with the intent to distribute due to the amount and packaging. The presence of a firearm in the satchel also supports my opinion in that drug dealers often carry firearms to protect themselves, the controlled substances, and sales proceeds. Note, however, that the BPD narcotics lab has not completed their tests of the substances, and therefore at the time of this affidavit, the substances are merely suspected controlled substances.

16. The firearm was test fired and determined to be operable, satisfying the definition of a firearm in 18 U.S.C. § 921. The firearm was not manufactured in Maryland and therefore traveled in interstate commerce prior to its recovery. The firearm was swabbed for the possible presence of epithelial cells. The swabs cannot be forwarded for DNA analysis until a standard for a suspect is obtained and a comparison is requested.

### IV. FORENSIC ANALYSIS OF ELECTRONIC COMMUNICATIONS DEVICES

17. Based on my training, I know that electronic devices such as cellular phones (smartphones) can store information for long periods of time. Similarly, things that have been viewed via the internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools. There is probable cause to believe that things

that were once stored on the **SUBJECT TELEPHONE** may still be stored on those devices, for various reasons, as discussed in the following paragraphs.

18.     As further described in Attachment B-1, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **SUBJECT TELEPHONE** was used, the purpose of its use, who used it, and when.

19.     There is probable cause to believe that this forensic electronic evidence might be stored within the **SUBJECT TELEPHONE** because data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

20.     Forensic evidence on a device can also indicate who has used or controlled the device.  This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

21.     A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

22. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

23. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

## V.   CONCLUSION

24. WHEREFORE, I respectfully request that this Court issue a warrant to search the **SUBJECT TELEPHONE**, further described in Attachment A-1, for certain evidence and information, further described in Attachment B-1.

25. I believe there is good cause to authorize the requested search of the phone at any time of the day or night. The **SUBJECT TELEPHONE** is already in law enforcement custody, and it is reasonable to allow law enforcement to execute the requested search at any hour of the day, even during the evening or night, if doing so is convenient for the investigators or examiners. Since the device is already in law enforcement custody, there is no prejudice to any other person from this request.

26. In addition, based on my training and experience, I believe that BENTON's DNA will be on the firearm recovered during his arrest. A known sample of his DNA is required to test and compare any and all DNA recovered. Accordingly, I am requesting authorization for a warrant

to obtain samples of DNA for comparison purposes in the form of saliva from BENTON to compare to the swabs taken from the firearm that I believe was possessed by BENTON.

I declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

ADAM STJOHN
Digitally signed by ADAM STJOHN
Date: 2021.10.28 14:54:13 -04'00'

_____
Special Agent Adam St. John
Bureau of Alcohol, Tobacco, Firearms and Explosives

Sworn to before me over the telephone and signed by me pursuant to Fed. R. Crim. P. 4.1 and 41(d)(3) on October 28, 2021.

_____
Hon. Thomas M. DiGirolamo
United States Magistrate Judge

9

1:21-mj-2975 to -2976 TMD

# ATTACHMENT A-1
**Device to be Searched**

a. A black Apple iPhone 12 bearing IMEI# 359669608706239. ("**SUBJECT TELEPHONE**")

Which is currently in the custody of ATF in Baltimore, Maryland.

1:21-mj-2975 to -2976 TMD

## ATTACHMENT A-2
### Photograph of Person to be Searched

Tyree BENTON
YOB: 1993
Currently residing at: Central Booking and Intake Facility, E Madison Street, Baltimore, MD
Last four digits of FBI No.: 3AE3



## ATTACHMENT B-1
### Items to be Seized

All records contained in the **SUBJECT TELEPHONE** (described in Attachment A-1), which constitute evidence of violations of the **SUBJECT OFFENSES**, including the following items, as outlined below:

1. Contact logs that refer or relate to the user of any and all numbers on the **SUBJECT TELEPHONE**.

2. Call logs reflecting date and time of received calls.

3. Any and all digital images and videos of persons associated with this investigation.

4. Text messages to and from the **SUBJECT TELEPHONE** that refer or relate to the crimes under investigation.

5. Records of incoming and outgoing voice communications that refer or relate to the crimes under investigation.

6. Voicemails that refer or relate to the crimes under investigation.

7. Voice recordings that refer or relate to the crimes under investigation.

8. Any data reflecting the phone's location.

9. Contact lists.

10. Any and all records related to the location of the user(s) of the device.

11. Evidence of who used, owned, or controlled the **SUBJECT TELEPHONE** at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, email, email contacts, "chat," instant messaging logs, photographs, and correspondence;

12. Evidence of software that would allow others to control the **SUBJECT TELEPHONE**, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

13. Evidence of the lack of such malicious software;

14. Evidence of the attachment to the **SUBJECT TELEPHONE** of other storage devices or similar containers for electronic evidence;

15. Evidence of counter forensic programs (and associated data) that are designed to eliminate data from the **SUBJECT TELEPHONE**;

16. Evidence of the times the **SUBJECT TELEPHONE** was used;

17. Passwords, encryption keys, and other access devices that may be necessary to access the **SUBJECT TELEPHONE**;

18. Documentation and manuals that may be necessary to access the **SUBJECT TELEPHONE** or to conduct a forensic examination of the **SUBJECT TELEPHONE**;

19. Contextual information necessary to understand the evidence described in this attachment.

With respect to the search of any of the items described above which are stored in the form of magnetic or electronic coding on computer media or on media capable of being read by a computer with the aid of computer-related equipment (including CDs, DVDs, thumb drives, flash drives, hard disk drives, or removable digital storage media, software or memory in any form), the search procedure may include the following techniques (the following is a non-exclusive list, and the government may use other procedures that, like those listed below, minimize the review of information not within the list of items to be seized as set forth herein, while permitting government examination of all the data necessary to determine whether that data falls within the items to be seized):

1. surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for markings it contains and opening a drawer believed to contain pertinent files);

2. "opening" or cursorily reading the first few "pages" of such files in order to determine their precise contents;

3. "scanning" storage areas to discover and possible recover recently deleted files;

4. "scanning" storage areas for deliberately hidden files; or

5. performing key word searches or other search and retrieval searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are intimately related to the subject matter of the investigation.

If after performing these procedures, the directories, files or storage areas do not reveal evidence of the specified criminal activity, the further search of that particular directory, file or storage area, shall cease.

With respect to the search of the information provided pursuant to this warrant, law enforcement personnel will make reasonable efforts to use methods and procedures that will locate and expose those categories of files, documents, communications, or other electronically stored information that are identified with particularity in the warrant while minimizing the review of information not within the list of items to be seized as set forth herein, to the extent reasonably

practicable. If the government identifies any seized communications that may implicate the attorney-client privilege, law enforcement personnel will discontinue its review and take appropriate steps to segregate all potentially privileged information so as to protect it from substantive review. The investigative team will take no further steps regarding any review of information so segregated absent further order of the court. The investigative team may continue to review any information not segregated as potentially privileged.

**ATTACHMENT B-2**
**Description of Items to be Seized**

Buccal (oral) swabs of the inside of Tyree BENTON's mouth limited to the extent where sufficient samples of DNA are obtained.